IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NICHOLAS T. COLYER, by his  :   No. 3:21cv1117
Guardian AMY JO DRUCKEMILLER,  :
      Plaintiff     :   (Judge Munley)
            :
    v.         :   (Chief Magistrate Judge Bloom)
            :
COUNTY OF MIFFLIN, et al.,    :
      Defendants   :

## MEMORANDUM

Plaintiff Nicholas T. Colyer initiated this action against various correctional and medical personnel employed at Mifflin County Correctional Facility ("MCCF"), asserting claims under 42 U.S.C. § 1983 ("Section 1983") for excessive force, conspiracy to violate his civil rights, and deliberate indifference to his medical needs as well as related state law claims. These claims arise from an altercation that allegedly occurred while Colyer was incarcerated at MCCF in June 2019. Plaintiff also advances Section 1983 claims against Mifflin County and Joshua Garver, MCCF's warden, based on theories of municipal liability and failure to train and supervise correctional staff.

This matter was referred to Chief United States Magistrate Judge Daryl F. Bloom for the issuance of a report and recommendation ("R&R") with respect to defendants' motion for summary judgment. (Doc. 100, R&R). Chief Magistrate

Judge Bloom recommended that defendants' motion be granted. (Id.) Colyer filed objections to the R&R and defendants responded. (Docs. 101, 102). The R&R is thus ripe for disposition.

## Background

What began as a single incident gave rise to multiple constitutional claims, and the record, in significant part, bears them out.[1] Colyer commenced this action against Lieutenant Shane Tomlinson, Correctional Officer Kyle Chesney, Licensed Practical Nurse ("LPN") Tracy Byers, Warden Joshua Garver, and Mifflin County.[2] Upon review, the case will proceed to trial solely as to Lieutenant Tomlinson and Officer Chesney.

After his arrest on an outstanding bench warrant, Colyer was incarcerated at MCCF in June 2019. (Doc. 100, R&R at 2). Prior to his incarceration, Colyer had been involuntarily committed by his mother and was treated at Geisinger Lewistown Hospital. (Id.) Plaintiff was discharged only days before his arrest with instructions to comply with his prescribed medication regimen. (Id.) Colyer

---

[1] Unless noted otherwise, the court adopts the factual background set forth in the R&R, (Doc. 100, R&R), as the parties do not dispute those facts. All facts from the record are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015) (citation omitted).

[2] Several claims and defendants have been dismissed from this action by stipulation. (Docs. 50-51, 68, 70, 81). The status of Defendant "Beaver" remains unclear. It does not appear that defendants sought summary judgment on his behalf. (See Doc. 84).

2

also had a history of illegal drug use—specifically methamphetamine—and was known at MCCF due to his prior incarcerations. (Id. at 2-3). In his deposition, Colyer testified that he had been incarcerated at MCCF approximately ten to fifteen times before the events at issue here. (Doc. 83-3, Ex. B., Colyer Dep. at 111:10-15)

Colyer was booked at MCCF on July 21, 2019. (Doc. 100, R&R at 3). At intake, he was strip searched and placed in an observation cell. (Id.) Lieutenant Shane Tomlinson testified that when he later came on shift, he was informed that Colyer had been "dry celled" because staff suspected that he may have had drugs concealed on his person. (Doc. 83-7, Ex. F, Tomlinson Dep. at 80:20-81:11). Defendant Tomlinson testified that a "dry cell" is a video-monitored cell where the toilet water is turned off to prevent inmates suspected of possessing contraband from disposing of that by flushing it. (Id. at 74:4-16). Shortly after beginning his shift, Tomlinson escorted Colyer to medical. (Doc. 100, R&R at 3). According to Tomlinson's testimony, he was familiar with Colyer from prior incarcerations and believed that Colyer was not in normal state of mind. (Doc. 83-7, Ex. F, Tomlinson Dep. at 115:8-16, 117-19-118:10). This conclusion was based in part on Colyer's behavior, including kicking his cell door, and reports that he may have been under the influence of drugs. (Id. at 113:1-115:16).

3

Colyer was evaluated by LPN Byers, the on-duty nurse. (Doc. 100, R&R at 3). Byers took Colyer's vital signs and asked him questions about his medications. (Id. at 3-4). LPN Byers testified that Lieutenant Tomlinson had told her that Colyer had said he "was using a lot of meth" prior to incarceration. (Doc. 83-10, Ex. I, Byers Dep. at 70:2-24). Byers asked plaintiff about his medications and whether he was under the influence of any substances. (Doc. 100, R&R at 3-4). Colyer reported that he had recently been treated by Doctor Patel and denied being under the influence of any substances. (Id. at 4). LPN Byers testified that she reviewed plaintiff's medications, knew Doctor Patel to be a psychiatric provider, and did not observe anything that required contacting a physician. (Id.) Colyer then returned to his cell.

Surveillance footage shows Colyer in his cell from approximately 2:48 p.m. until the incident at the heart of this matter. (Id.) During that time, Colyer repeatedly kicked the door and banged on the cell door. (Id.) Plaintiff testified that he recalled yelling and kicking the door throughout the day. (Id.) At approximately 8:15 p.m., Lieutenant Tomlinson decided to enter Colyer's cell and remove his shoes, believing that doing so would deter Colyer from kicking the door. (Id.) Tomlinson testified that the kicking posed a safety risk because inmates had previously broken the glass in cell doors and injured themselves or others. (Id. at 4-5).

4

Lieutenant Tomlinson entered the cell with correctional officers Chesney and Briggs and ordered Colyer to surrender his shoes. (Id. at 5).  Colyer refused. (Id.)  Tomlinson then ordered Colyer to cuff-up. (Id.)  Instead of complying, Colyer stood up and tried to run out of the cell, colliding with Chesney. (Id.)  Tomlinson attempted to deploy a taser to gain compliance, but Colyer continued resisting and moved underneath his bed. (Id.)  When Tomlinson again attempted to use the taser, Colyer got up, punched Chesney in the face, and ran out of the cell into the booking area. (Id.)

Surveillance footage shows Colyer running from the cell into the booking area. (Id.)  Tomlinson used pepper spray (also known as O.C. spray or Oleoresin Capsicum) to gain compliance, but Colyer ran into the caged booking area. (Id.)  The facility's control panel was located in the booking area. (Id.)  After running into that area, Colyer locked himself inside a staff bathroom behind the booking counter. (Id.)  A "Code Green" was called, indicating a fight unfolding. (Id. at 5-6).

When Colyer exited the bathroom, approximately six correctional officers and LPN Byers attempted to restrain him. (Doc. 86, Def. Ex. O, Booking Cage Right Video).  During that process, Colyer bit Chesney's finger and drew blood. The officers and LPN Byers ultimately subdued Colyer, restraining his hands and feet. (Id. Def. Ex. O, Booking Cage Right Video at 2:25-4:55).  Four officers, including Lieutenant Tomlinson, then carried Colyer back toward his cell. (Id. Def.

Ex. O, Booking Cage Right Video at 4:55-5:05). Surveillance footage shows that approximately three and a half minutes elapsed from the time Colyer exited the cell until he was returned in restraints. (Id. Def. Ex. O, Booking Cage Right Video at 1:55-5:05). Colyer continued resisting even after being placed in handcuffs and leg shackles. (Doc. 100, R&R at 6). Lieutenant Tomlinson then called for a restraint chair. (Id.) Surveillance footage depicts several officers and LPN Byers attempting to secure Colyer in the restraint chair over the course of several minutes while Colyer actively resisted. (Id.)

Once plaintiff was fully secured in the restraint chair, staff observed that Colyer had become unconscious. (Id.) Plaintiff was then removed from the restraint chair, and staff began chest compressions. (Id.) Emergency Medical Services ("EMS") was called, and a portable Automated External Defibrillator ("AED") was retrieved. (Id.) EMS arrived approximately five minutes later and transported Colyer to the hospital. (Id. at 6-7).

Colyer's hospital records from the day of the incident indicate that he tested positive for amphetamines despite previously denying substance use. (Id. at 7). Plaintiff alleges that he sustained multiple injuries as a result of this incident, including a traumatic brain injury, cardiac arrest, lung contusions, a sternal fracture, lacerations, kidney injury, and neurological deficits. (Id.)

6

Colyer filed this action on June 18, 2021, asserting claims under Section 1983.[3] (Doc. 1). Plaintiff alleges that the incident and resulting injuries violated his constitutional rights.

The outstanding claims are summarized in the following chart:

| Claim | Description | Defendant(s) |
|---|---|---|
| Count I | Excessive Force – Fourteenth Amendment & Section 1983 | Lieutenant Tomlinson and Officer Chesney |
| Count II | Assault & Battery | Lieutenant Tomlinson and Officer Chesney |
| Count III | Intentional Infliction of Emotional Distress ("IIED") | Lieutenant Tomlinson and Officer Chesney |
| Count IV | Conspiracy to Violate Federal and State Civil Rights | Lieutenant Tomlinson and Officer Chesney |
| Count V | Failure to Train, Supervise, and Discipline – Section 1983 | Mifflin County and Warden Joshua E. Garver |
| Count VI | Deliberate Indifference to Serious Medical Needs – Fourteenth Amendment | Mifflin County and Warden Joshua E. Garver |
| Count VII | Deliberate Indifference to Serious Medical Needs – Fourteenth Amendment | Lieutenant Tomlinson and Officer Chesney |
| Count VIII | Deliberate Indifference to Serious Medical Needs – Fourteenth Amendment | LPN Byers |

---

[3] As plaintiff brings suit pursuant to Section 1983, the court has federal question jurisdiction. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

Defendants moved for summary judgment, arguing that no genuine dispute of material fact exists and that they are entitled to judgment as a matter of law. (Doc. 84). Chief Magistrate Judge Bloom concluded that no genuine issues of material fact exist and recommended that the motion for summary judgment be granted. (Doc. 93). Colyer filed objections, arguing that the decision not to consider his expert reports was erroneous. (Doc. 94). The court sustained the objections and directed Colyer to submit affidavits or declarations in support of the expert reports and permitted supplemental briefing. (Doc. 96). The matter was then referred back to Chief Magistrate Judge Bloom to determine whether Colyer had produced admissible evidence demonstrating a genuine issue of material fact. (Id.)

The R&R again concluded that no genuine disputes of material fact exist and recommended granting defendants' motion for summary judgment. (Doc. 100, R&R at 33). For the reasons that follow, the R&R will not be adopted in its entirety and the motion for summary judgment will be granted in part and denied in part.

**Legal Standard**

### 1. Objections to R&Rs

In disposing of objections to a magistrate judge's R&R, the district court must make a *de novo* determination of those portions of the report against which

objections are made. 28 U.S.C. § 636(b)(1)(c); see also Sullivan v. Cuyler, 723 F.2d 1077, 1085 (3d Cir. 1983). The court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. Henderson v. Carlson, 812 F.2d 874, 877 (3d Cir. 1987). The district court judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. Id.

### 2. Motions for Summary Judgment

The R&R addressed defendant's motion for summary judgment. Summary judgment is proper when there is no genuine issue of material fact in the case and the moving party is entitled to judgment as a matter of law. Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010) (citation omitted); see also FED. R. CIV. P. 56(a). "A fact is material if its resolution 'might affect the outcome of the suit under the governing law,'…[a]nd a dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Mall Chevrolet, Inc. v. Gen. Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

At this stage, the judge's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. All "facts in dispute," Daniels, 776 F.3d at 187, and all "inferences to be drawn from the underlying facts must be viewed in the light

9

most favorable to the [opposing] party[,]" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up). "[W]hen there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters & Joiners, 676 F.2d 81, 84 (3d Cir. 1982). Furthermore, "a court's role remains circumscribed in that it is inappropriate for a court to resolve factual disputes and to make credibility determinations." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) (citation omitted). "[W]here the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Id. (citations omitted).

A motion for summary judgment may also be granted where a moving party demonstrates that the nonmoving party "has not made 'a showing sufficient to establish the existence of an element essential to that party's case ... on which that party will bear the burden of proof at trial.' " Mall Chevrolet, Inc., 99 F.4th at 630 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 332 (1986)). After a moving party carries their burden to show the absence of a genuine, material factual dispute, Rule 56 flips the burden onto "the nonmovant to 'go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

10

there is a genuine issue for trial.' " Daubert v. NRA Grp., LLC, 861 F.3d 382, 391 (3d Cir. 2017) (quoting Celotex Corp., 477 U.S. at 324).  The non-moving party must "do more than 'simply show that there is some metaphysical doubt as to the material facts." Id. (quoting Matsushita Elec. Indus. Co., 475 U.S. at 587).

If a party fails to properly address another party's assertion of fact as required by Rule 56, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]" FED. R. CIV. P. 56(e)(3).  Summary judgment is appropriate where the moving party is entitled to judgment as a matter of law. Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990).

**Analysis**

Chief Magistrate Judge Bloom reached six principal conclusions. (Doc. 100, R&R at 11-33).  First, the R&R determined that plaintiff's expert declarations improperly opine on the ultimate issue and therefore constitute inadmissible evidence.  Second, the R&R concluded that Colyer failed to establish that Lieutenant Tomlinson and Officer Chesney used excessive force or were deliberately indifferent to his medical needs.  Third, the R&R concluded that Colyer failed to satisfy the elements of a Section 1983 conspiracy to violate civil rights as between Lieutenant Tomlinson and Officer Chesney.  Fourth, the R&R

11

found that the record contains no evidence from which a reasonable factfinder could determine that LPN Byers was deliberately indifferent to Colyer's medical needs. Fifth, the R&R determined that Colyer's claims against Warden Garver and Mifflin County, including his Monell claim, do not survive summary judgment. Sixth, Chief Magistrate Judge Bloom recommended that the court should decline to exercise supplemental jurisdiction over plaintiff's state law claims.

Colyer objected to all of these conclusions. Following a *de novo* review, the court will adopt the R&R in part, but not in full. Accordingly, the motion for summary judgment will be granted in part and denied in part.

### 1. Admissibility of Plaintiff's Expert Declarations

Plaintiff objects to the R&R's conclusion that plaintiff's expert declarations are inadmissible under the Federal Rules of Evidence.[4] (Doc. 101 at 6-7). Chief Magistrate Judge Bloom declined to consider those declarations on the ground that they improperly opine on the ultimate issue and therefore cannot be relied

---

[4] Previously, Chief Magistrate Judge Bloom excluded plaintiff's expert reports on the ground that they were not accompanied by a sworn declaration or affidavit affirming the content of the reports. (Doc. 93). After the court referred the matter back to the magistrate judge, Colyer submitted sworn declarations of his experts, Marc Bullaro and Gregory Famiglio, MD, MBA. (Doc. 98-3, Ex. C., Bullaro Decl.; Doc. 98-4, Ex. D, Famiglio Decl.). See FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

upon at summary judgment. Upon review, however, the court concludes that portions of the declarations are admissible and will be considered.

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56 (c)(2). The admissibility of expert opinion testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.[5]

The admissibility of the expert declarations under Federal Rule of Evidence 702 is not disputed here.  Both the R&R and defendants acknowledged that the declarations satisfy Federal Rule of Evidence 702. (Doc. 100, R&R at 11).  The

---

[5] "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge [, i.e., reliability]; and (3) the expert's testimony must assist the trier of fact [.]" United States v. Schiff, 602 F.3d 152, 172 (3d Cir. 2010) (alterations in original) (quoting Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008)).

dispute, instead, concerns whether the experts improperly opine on ultimate legal issues, rendering their opinions inadmissible. (Id.)  The R&R concluded that they do; plaintiff argues that they do not.  The court concludes that both positions are partially correct.

Federal Rule of Evidence 704 permits expert testimony that "embraces an ultimate issue to be decided by the trier of fact," but an expert witness may not render a legal opinion. Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006) (quoting United States v. Leo, 941 F.2d 181, 195–96 (3d Cir. 1991)). This limitation is particularly important in jury trials. Lozano v. City of Hazleton, 241 F.R.D. 252, 256 (M.D. Pa. 2007) (Munley, James, J.).  Otherwise, expert legal opinions could "usurp the District Court's pivotal role in explaining the law to the jury." First Nat. State Bank of New Jersey v. Reliance Elec. Co., 668 F.2d 725, 731 (3d Cir. 1981).

In excessive force cases, for example, an expert may not opine that force was excessive, because such testimony constitutes an impermissible legal opinion. Patrick v. Moorman, 536 F. App'x 255, 258 (3d Cir. 2013). "In a § 1983 suit, 'reasonableness' is practically interchangeable with 'excessiveness.' " Id. Because "the boundaries of Rule 704 are often hazy... expert testimony becomes impermissible if the expert's opinion would interfere with the district court's 'pivotal role in explaining the law to the jury' ". Id. (citing Berckeley, 455 F.3d at

14

217.).  Accordingly, courts may exclude or disregard those portions of expert testimony that opine on the reasonableness of an officer's conduct. Id.

Here, Colyer relies on the declarations of Marc Bullaro and Gregory Famiglio, MD, MBA.[6]  As the R&R correctly observed, the experts' declarations are based on sufficient facts in the record. However, portions of their declarations clearly draw legal conclusions on ultimate issues.  For instance, Bullaro opines that "Mifflin County Correctional personnel had a duty of care to Nicholas Colyer and breached that duty of care [.]" (Doc. 98-3, Ex. C., Bullaro Decl. ¶ (1)). Additionally, Bullaro opines that the force used was "unnecessary and excessive," and that Tomlinson and Byers "were deliberately indifferent." (Id. ¶¶ 11, 14, 21 (1)-(4), (7)).

Similarly, Doctor Famiglio concludes in his declaration that "correctional and medical staff of the Mifflin County Correctional Facility [] grossly failed to meet the standard of care" and that "Colyer's civil rights were violated when the

---

[6] Marc Bullaro serves as an Adjunct Assistant Professor at John Jay College of Criminal Justice, City University of New York, where he teaches in the graduate Criminal Justice program. (Doc. 98-3, Ex. C., Bullaro Decl. ¶ 1).  Bullaro previously served as an Assistant Deputy Warden with the New York City Department of Correction for 28 years and eight months before retiring. (Id. ¶ 3).

Gregory Famiglio, MD, MBA is a practicing physician, board certified in addiction medicine and anesthesiology. (Doc. 98-4, Ex. D., Famiglio Decl. ¶ 2). He is licensed in Pennsylvania and Florida. (Id.)  Doctor Famiglio previously served as Medical Director of methadone and buprenorphine clinics in State College, Pennsylvania. (Id. ¶ 3).  He has approximately ten years of experience as Medical Director for various state and federal prisons, where he treated numerous alcohol and drug detoxification cases and acute psychiatric emergencies involving maximum-security inmates. (Id.)

staff demonstrated deliberate indifference to his serious needs for medical care under the 14th Amendment." (Doc. 98-4, Ex. D, Famiglio Decl. ¶¶ 9, 10).  Doctor Famiglio further opines that "gross medical negligence and carelessness existed on the part of LPN Byers" and concludes that "the actions and inactions of LPN Byers and Lt. Tomlinson constitute deliberate indifference to the medical needs of Nicholas Colyer." (Id. ¶¶ 12, 14).

The R&R correctly concluded that such portions of the expert declarations are inadmissible under Federal Rule of Evidence 704.  However, the R&R did not consider the remaining portions of the expert declarations.

The declarations represent Bullaro and Famiglio's testimony in this matter.  When portions of expert testimony are inadmissible, that defect does not render their entire testimony inadmissible under the rules of evidence.  Rather, courts may disregard only those portions that constitute impermissible legal conclusions and consider the remainder.  The Third Circuit affirmed this approach in Patrick, where the district court did not exclude the expert testimony in its entirety but instead ignored only those portions opining on what a "reasonable officer would have done under the circumstances." Patrick, 536 F. App'x at 258 n.4 (quoting Patrick v. Moorman, 855 F. Supp. 2d 392, 402 n. 9 (E.D. Pa. 2012)).  Courts in the Middle District have likewise excluded only those portions of expert reports that contain legal conclusions while taking into account the remaining admissible

16

opinions. See Timko v. Traugh, No. 4:22-CV-01195, 2024 WL 4351458, at *4-5 (M.D. Pa. Sept. 30, 2024); see also Ward v. Noonan, 147 F. Supp. 3d 262, 279 nn.16, 18 (M.D. Pa. 2015).

Accordingly, the R&R will not be adopted to the extent it did not take into account the portions of the expert declarations that do not contain legal conclusions. The court will consider the remaining admissible portions of the expert declarations in resolving the motion for summary judgment.[7]

### 2. Excessive Force

Colyer advances excessive force claims under Section 1983 against Lieutenant Tomlinson and Officer Chesney, alleging a violation of the plaintiff's Fourteenth Amendment rights.[8] According to Colyer, those defendants maliciously and sadistically used force against him during the underlying incident, including deploying a taser, kicking him, and punching him. (Doc. 1, Compl. ¶ 52). The R&R concluded that there are no genuine disputes of material fact as to whether Defendants Tomlinson and Chesney used objectively unreasonable

---

[7] The same analysis applies to the expert reports: the court will disregard any portions that contain legal conclusions but will rely on the remaining admissible portions. (See Doc. 91-5, Pl. Ex. B, at ECF pp. 4-10; Pl. Ex. C at ECF pp. 11-23).

[8] Section 1983 serves as the vehicle through which private citizens may seek redress for violations of federal constitutional rights committed by state officials. The statute is not a source of substantive rights; rather it serves as a mechanism for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002).

force in violation of the Fourteenth Amendment. (Doc. 100, R&R at 20). Colyer disagrees, as does this court.

Pretrial detainees, like Colyer, have a Fourteenth Amendment due process right to be free "from the use of excessive force that amounts to punishment." Kingsley v. Hendrickson, 576 U.S. 389, 397–98 (2015) (quoting Graham v. Connor, 490 U.S. 386, 395 n. 10 (1989)). Notably, "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.' "⁹ Id. at 400-401 (citation omitted).

To prevail on an excessive force claim in this context, a plaintiff must show "that the force purposely or knowingly used against him was objectively unreasonable." Id. at 396-97. Objective reasonableness turns on the "facts and circumstances of each particular case." Id. (quoting Graham, 490 U.S. at 396)).

The Supreme Court has identified a non-exhaustive list of factors relevant to this inquiry, including:

> [T]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

---

⁹ The U.S. Supreme Court has distinguished excessive force claims brought under the Eighth Amendment from those brought under the Fourteenth Amendment, emphasizing that the language of the Eighth Amendment's Cruel and Unusual Punishment Clause and the Fourteenth Amendment's Due Process Clause "differs, and the nature of the claims often differs." Kingsley, 576 U.S. at 400–01.

Id.

In analyzing these factors, "a court must make this determination from the perspective of a reasonable officer on the scene . . . not with the 20/20 vision of hindsight." Id.   A court must also account for the legitimate interests stemming from the government's need to manage the facility in which the individual is detained, appropriately deferring to the policies and practices that, in the judgment of jail officials, are necessary to preserve internal order and discipline and to maintain institutional security. Id. (citing Bell v. Wolfish, 441 U.S. 520, 540 (1979)).

Colyer's behavior on the day in question required attention, as he may have been under the influence of drugs.  Lieutenant Tomlinson testified that Colyer did not appear to be in his right state of mind. (Doc. 83-7, Ex. F. Tomlinson Dep. at 115:12-6, 116:8-17).  According to Tomlinson's testimony, Colyer was speaking incoherently about "Jesus and God" and was not making sense during conversations. (Id. at 120:12-18).  Tomlinson added that he "didn't know if [Colyer] was detoxing for something." (Id.)  Tomlinson observed that plaintiff was suspected to have been hiding drugs internally, i.e., in his anus.[10] (Id. at 77:7-21).  Tomlinson noted that Colyer's eyes were dilated and he

---

[10] Lieutenant Tomlinson testified that Colyer underwent multiple strip searches, none of which resulted in the discovery of drugs. (Doc. 83-7, Ex. F. Tomlinson Dep. at 79:14-18).

19

believed that plaintiff may have been using drugs. (Id. at 132:1-20, 133:3-5). For that reason, Tomlinson decided that Colyer should be taken to medical. (Id. at 120:12-20). When Colyer began kicking the glass door in his cell, Tomlinson concluded that this behavior further indicated that plaintiff was under the influence of drugs or was experiencing withdrawal. (Id. at 151:12-153:9).

Video footage also shows Colyer disobeying orders from correctional officers when asked to remove his shoes and position himself to be handcuffed. (Doc. 86, Def. Ex. N, Booking Cell 7 Video). Colyer instead continued resisting and moved underneath his bed. When Tomlinson attempted to gain compliance, Colyer got up, punched Chesney in the face, and ran out of the cell into the booking area. (Id. Def. Ex. N, Booking Cell 7 Video at 15:20-15:55). There is little question that Colyer's resistance and aggression escalated the severity of the security problem.

After running into the booking area and locking himself inside a staff bathroom, Colyer was eventually restrained by the hands and feet and carried back toward his cell. (Doc. 86, Def. Ex. O, Booking Cage Right Video). During that process, Colyer bit Chesney's finger. Staff members struggled to restrain plaintiff, and doing so was not an easy task. (Id. Def. Ex. O, Booking Cage Right Video at 1:50-5:05).

As the Third Circuit Court of Appeals has emphasized:

"Safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." Kingsley, 576 U.S. at 399 (internal quotation marks omitted) (quoting Florence v. Bd. of Chosen Freeholders, [566 U.S. 318, 326 (2012))]. Officers facing disturbances "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Id. (internal quotation marks omitted) (quoting Graham, [490 U.S. at 397)]. And "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates an inmate's constitutional rights. Hudson v. McMillian, [503 U.S. 1, 9 (1992)] (internal quotation marks omitted) (quoting [Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973))].

Jacobs v. Cumberland Cnty., 8 F.4th 187, 195 (3d Cir. 2021).

However, the excessive force analysis does not end here and cannot be decided as a matter of law. What followed, after officers restrained Colyer, was not merely a push or shove, but conduct that a reasonable jury could find far more serious.

After Colyer was brought back into his cell, restrained by his hands and feet, Lieutenant Tomlinson dropped him abruptly on the ground.[11] (Doc. 86, Def. Ex. N, Booking Cell 7 Video). It is unclear whether Colyer landed first on his head or back. Lieutenant Tomlinson then placed his left foot on Colyer's abdomen and slapped his face. At this point, Colyer stopped moving and

---

[11] The court cites video timestamps at the end of each paragraph to avoid excessive inline citations.

appeared exhausted.  When the plaintiff made a slight movement that did not appear to be resistance, several officers rushed to immobilize him.  Lieutenant Tomlinson then appears to step on Colyer's abdomen with his weight while plaintiff was on the ground. Tomlinson kept his foot on Colyer's body for approximately a minute. (Id. Def. Ex. N, Booking Cell 7 Video at 18:57-22:50).

Next, Tomlinson called for a restraint chair.  Surveillance video captures eight correctional officers and LPN Byers attempting to secure Colyer in the restraint chair over a period of nearly five to seven minutes. (Doc. 86, Def. Ex. O, Booking Cage Right Video).  During that process, Officer Chesney is seen twisting and holding Colyer's neck in an awkward manner while attempting to position him.  Colyer appears largely unresponsive during this time, with his eyes open but with little movement.  Even when Colyer's neck and head hung limp, Chesney returned to forcibly twisting plaintiff's neck to the left.  At the same time, Lieutenant Tomlinson appeared to strike and punch Colyer's lower abdomen or genital area with his fist on three occasions.  Shortly thereafter, Colyer became fully unresponsive and his body went limp, at which point CPR was initiated.[12] (Id. Def. Ex. O, Booking Cage Right Video at 8:50-19:55).

---

[12] With respect to the use of the taser on Colyer, the video footage shows that Lieutenant Tomlinson deployed the taser at least once at the outset of the altercation while Colyer was still in his cell. (Doc. 86, Def. Ex. N, Booking Cell 7 Video).  Beyond that initial use, the video footage does not clearly establish how many additional times the taser was deployed.  During his testimony, however, Tomlinson admitted that he attempted to taser Colyer "probably ten to

Returning to the Kingsley factors here, a reasonable jury could find that each weigh in Colyer's favor, particularly with what transpired after his hands and legs were restrained. A reasonable jury could conclude that : 1) the relationship between the need for the use of force and the amount of force used was disproportionate; 2) Colyer's injuries were significant; 3) Defendants Tomlinson and Chesney used excessive force at multiple points; 4) although the security problem was initially severe, the threat diminished once Colyer was restrained; and 5) at the time Tomlinson and Chesney applied force, Colyer was not actively or continuously resisting.

A reasonable factfinder, upon observing the officers' body language and facial expressions, could conclude that Lieutenant Tomlinson paused to deliberate before punching Colyer in a highly sensitive area, and that he did this not to restrain Colyer, but to inflict a humiliating injury. Likewise, a reasonable

---

fifteen more [times]" in addition to the initial discharge. (Doc. 83-7, Ex. F, Tomlinson Dep. at 158:7-9, 160:1-4).

Plaintiff's expert, Doctor Famiglio opined that:

> [Colyer] was tasered up to 25 times, slammed against the floor, kicked, punched and even had a foot on his chest during the five-minute altercation. After being subdued [Colyer] was seen on film being carried without much resistance nor struggle near Cell 7 and placed in the restraint chair with his head aggressively controlled by a CO possibl[y] occluding his airway.

(Doc. 98-4, Ex. D., Famiglio Decl. ¶ 8).

23

jury could find that Officer Chesney forcefully jerked Colyer's neck for the purpose of causing pain.  Accordingly, a reasonable jury could conclude that Officer Chesney and Lieutenant Tomlinson's "actions [were] taken with an expressed intent to punish" Colyer after causing this disturbance in the jail. Kingsley, 576 U.S. at 398.

Accordingly, the court will not adopt the R&R's recommendation to grant summary judgment on Colyer's excessive force claims against Lieutenant Tomlinson and Officer Chesney.

### 3. Deliberate Indifference to Medical Needs

Colyer alleges in his complaint that Lieutenant Tomlinson, Officer Chesney, and LPN Byers were deliberately indifferent to his serious medical needs.  The R&R concluded that the record does not support such a finding.  Upon careful review, the court agrees with Colyer.  The record, viewed in the light most favorable to Colyer, creates a genuine dispute of material fact as to whether these defendants were deliberately indifferent to plaintiff's medical needs.

*Tomlinson and Chesney* – Colyer asserts that Defendants Tomlinson and Chesney knew that he was suffering from either mental illness or drug addiction and required medical attention. (Doc. 1, Compl. ¶ 83).  Instead of seeking such

care, they engaged him in a physical confrontation, where they deployed a taser, used force, and wrestled him to the ground.[13] (Id.)

To establish an Eighth Amendment medical claim, a plaintiff must show that: "(1) he had a serious medical need, (2) the defendants were deliberately indifferent to that need; and (3) the deliberate indifference caused harm to the plaintiff." Durham v. Kelley, 82 F.4th 217, 229 (3d Cir. 2023).

With respect to the first element, a medical need is considered serious if it "has been diagnosed by a physician as requiring treatment" or if it "is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (quoting Pace v. Fauver, 479 F. Supp. 456, 458 (D.N.J. 1979)). Additionally, "if 'unnecessary and wanton infliction of pain' results as a

---

[13] Although Colyer was a pretrial detainee at the time of the incident, and thus his medical claims arise under the Fourteenth Amendment rather than the Eighth Amendment, courts in this circuit have continued to apply Eighth Amendment standards to claims involving the adequacy of medical care provided to pretrial detainees. See Thomas v. City of Harrisburg, 88 F.4th 275, 281 n.23 (3d Cir. 2023) (applying Eighth Amendment standard to pretrial detainee's medical care claim); Palakovic v. Wetzel, 854 F.3d 209, 223 (3d Cir. 2017) (applying the Eighth Amendment standard to a pre-trial detainee's medical care claim while acknowledging that "a pre-trial detainee may bring a claim under the Due Process Clause of the Fourteenth Amendment that is essentially equivalent to the claim that a prisoner may bring under the Eighth Amendment."); Evans v. Columbia Cnty., 711 F. Supp. 3d 256, 275 (M.D. Pa. 2024) (collecting cases); Edwards v. Northampton Cnty., 663 F. App'x 132, 136–37 (3d Cir. 2016).

Accordingly, the court will apply existing Eighth Amendment jurisprudence to Colyer's Fourteenth Amendment medical claims.

25

consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the [E]ighth [A]mendment." Id. (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)).  Further, where denial or delay causes an inmate to suffer a life-long handicap, the medical need is deemed serious. Id.

Here, according to Lieutenant Tomlinson's testimony, he noticed that Colyer was not in his right state of mind. (Doc. 83-7, Ex. F. Tomlinson Dep. at 115:12-6, 116:8-17, 132:1-20, 133:3-5).  Tomlinson further testified that he believed that Colyer had been using drugs as his eyes were dilated. (Id.) Similarly, Officer Chesney testified that he "just knew [Colyer] was on a drug [.]" and that he was "not in the right state of mind."  (Doc. 83-8, Ex. G. Chesney Dep. at 70:7-18, 71:18-22).  Moreover, Chesney admitted that he had previously observed Colyer going through withdrawal from substances on several prior occasions in jail. (Id. at 137:12-23).  This testimony supports the conclusion that Colyer's medical needs were sufficiently obvious that both defendants recognized the need for medical attention.

Turning to the second element, that is, deliberate indifference, which is a subjective standard. Farmer v. Brennan, 511 U.S. 825, 840 (1994).  "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." Giles v. Kearney, 571 F.3d 318, 330 (3d Cir.

26

2009).  A prison official must have known of and disregarded an excessive risk to inmate health or safety by failing to take reasonable measures to abate it. Farmer, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.

However, an inmate need not show that a defendant intentionally sought to cause harm. Chavarriaga v. New Jersey Dep't of Corr., 806 F.3d 210, 227 (3d Cir. 2015).  Rather, deliberate indifference may be shown where "the defendant acted or failed to act despite having knowledge that [his] actions or inaction, as the case may be, would subject the inmate to a substantial risk of serious harm." Id. "In inadequate medical care cases, [the Third Circuit] specifically found deliberate indifference where objective evidence of a serious need for care is ignored and where 'necessary medical treatment is delayed for non-medical reasons.' " Thomas, 88 F.4th at 281 (quoting Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003)).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence [.]" Farmer, 511 U.S. at 842 (internal citation and quotation omitted).  A factfinder may thus conclude "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.

27

Here, Colyer contends that Lieutenant Tomlinson and Officer Chesney exhibited deliberate indifference to his medical needs. (Doc.1 Compl. ¶ 84). As previously mentioned above, both defendants were aware or, at least, suspected that Colyer was on drugs and not in his right state of mind.

Plaintiff's expert, Bullaro, opined that after Colyer was in custody "for more than 18 hours without his psychiatric medication and asking for a phone call and something to drink, Shift Commander Lt. Tomlinson made the decision to enter Colyer's cell and take his shoes to prevent Colyer from kicking the cell door." (Doc. 98-3, Ex. C. Bullaro Decl. ¶ 16). He further opined that "Lt. Tomlinson failed to recognize Colyer's deteriorating condition while in 'observation' cell #7 which he helped make worse by laughing at Nicholas Colyer." (Id.)

Regarding the cardiac arrest Colyer experienced during the incident, plaintiff's expert, Doctor Famiglio, opined that multiple factors could have precipitated the event, including: "repeated TASER shots (up to 24) to the core, traumatic pneumothorax from a chest kick, or obstruction of his airway when attempting to secure his body to the restraint chair from a twisting of the head and neck and forearm pressure on the throat." (Doc. 98-4, Ex. D, Famiglio Decl. ¶ 11).

Doctor Famiglio added that "Colyer's behavior progressively deteriorated in MCCF most likely due to an unfamiliar environment, lack of sleep, lack of his

28

psych meds and the stress of incarceration." (Id. ¶ 8).   Per Doctor Famiglio, it was unlikely that plaintiff was in acute withdrawal from methamphetamine because he had recently been hospitalized for two weeks and had been out for less than 24 hours. (Id.)  However, Doctor Famiglio added, "Meth use may have exacerbated [Colyer's] mania and psychosis." (Id.)  Regardless, Doctor Famiglio stated "[i]f unsure what to do, they should have sent him to the Emergency Room. This tragic event was extremely preventable."[14] (Id. ¶12).  Moreover, Doctor Famiglio noted that:

> Lt. Tomlison clearly knew [Colyer] was mentally ill, with acute mental status changes and active hallucinations that any minimally trained staff should have been concerned to consult medical or immediately refer to the Emergency Room. The correctional staff did not correctly assess the confrontation and elected to proceed in what ended up as a physical assault on Inmate Colyer under the guise of wanting to protect him and secure the facility. He should have been preemptively medicated or sent immediately to the local Emergency Room.

(Id. ¶ 10).

This record evidence creates a jury question as to whether Lieutenant Tomlinson and Officer Chesney wantonly denied or delayed Colyer's access to medical care.

---

[14] Doctor Famiglio further noted that, following Colyer's transport to the hospital, a "rapid urine drug screen returned positive for methamphetamine, however unfortunately, no confirmatory testing was requested." (Doc. 98-4, Ex. D, Famiglio Decl. ¶ 8).

With respect to the last element of Colyer's medical claim, that the deliberate indifference caused harm to plaintiff, there is ample evidence from which the jury could conclude that Colyer suffered harm as a result of the incident. The video footage depicts that, after Colyer lost consciousness and ceased breathing, correctional staff promptly initiated CPR. (See Doc. 86, Def. Ex. O, Booking Cage Right Video at 19:30-38:30). Following these events, and after being taken to the hospital, Colyer "was diagnosed . . . with traumatic cardiac arrest, severe anoxic and traumatic brain injury with posterior cerebral artery stroke, fractured sternum, tension pneumothorax (collapsed lung), bilateral blunt chest trauma, bilateral pulmonary contusion, and renal contusion that left him in a significant and permanent handicapped state." (Doc. 98-4, Ex. D, Famiglio Decl. ¶ 8). Ultimately, "[b]efore his hospital discharge on July 30, 2019, Nicholas Colyer was declared an incapacitated person, and his mother was appointed Guardian of his person and Estate." (Id.)

In sum, viewing the evidence in the light most favorable to Colyer, there is a genuine dispute of material facts as to whether Defendants Tomlinson and Chesney were deliberately indifferent to his serious medical needs. Accordingly, the R&R will not be adopted to the extent it recommends that summary judgment be entered on plaintiff's medical claims against those defendants.

30

*LPN Byers* – Turning next to Colyer's medical claim against LPN Byers, plaintiff alleges that Byers was deliberately indifferent to his medical needs. (Doc. 1, Compl. ¶ 88).   Colyer was evaluated by LPN Byers prior to the incident. (Doc. 100, R&R at 3).  Byers took Colyer's vital signs, reviewed his medications, and asked him whether he was under the influence of any substances. (Id. at 3-4). Colyer reported that he had recently been treated by Doctor Patel and denied being under the influence of drugs. (Id.)  LPN Byers testified that she reviewed plaintiff's medications, knew Doctor Patel to be a psychiatric provider, and did not observe anything that required contacting a physician. (Id.)

Nonetheless, Colyer contends that LPN Byers was deliberately indifferent to his medical needs by:

> (a) Failing to consider the significance of [his] prior history of mental illness, drug addiction, and drug use when evaluating him;
>
> (b) Failing to provide [him] with the medication that he was taking as prescribed for his mental health conditions;
>
> (c) Failing to have [him] promptly evaluated by an appropriate medical provider in order to determine his medical and mental health needs;
>
> (d) Failing to contact and communicate with appropriate medical providers about "Colyer's" medical and mental condition when they knew or should have known that they were incapable by reason of their training to provide appropriate diagnoses and treatment for his medical and mental health needs;

31

(e) Failing to request and arrange for "Colyer's" transfer to an appropriate outside medical facility and/or mental health facility for treatment of his medical and mental health conditions;

(f) Failing to intercede to prevent Correctional Officers from engaging "Colyer" while he was in the midst of bizarre and psychotic behavior caused by medical and/or mental health conditions;

(g) Failing to appropriately and timely monitor [him] during his incarceration in order to be aware of the deterioration of his medical and mental health conditions during said incarceration.

(Doc. 1, Compl. ¶ 88).

As a preliminary matter, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." Palakovic, 854 F.3d at 227.[15] "Nonetheless, there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." Id.

---

[15] The Third Circuit has found deliberate indifference where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). The Third Circuit has also held that "[n]eedless suffering resulting from a denial of simple medical care, which does not serve any penological purpose, ... violates the Eighth Amendment." Atkinson v. Taylor, 316 F.3d 257, 266 (3d Cir. 2003).

32

LPN Byers testified that she was told that Colyer "was using a lot of meth" prior to incarceration. (Doc. 83-10, Ex. I, Byers Dep. at 70:2-24). She also testified that Colyer denied drug use when she asked him. (Id. at 71:1-24). According to Byers, she did not drug test him because it was not policy to drug test every incoming inmate. (Id.) Nonetheless, Byers also testified that during the medical evaluation, Colyer was ranting about God and about being on the seventh floor of Geisinger Lewistown Mental Health Hospital. (Id. at 70:6-10, 111:6-11). Byers did not dispute that Colyer told her that he was being treated by a psychiatrist, Doctor Patel. (Id. 72:24-73:3).

Bullaro, plaintiff's expert, opined that: "LPN Tracy Byers . . . verified that Colyer was on psychiatric drugs by calling the pharmacy and ordering those drugs but did not verify the last time Colyer took the psychiatric medication." (Doc. 98-3, Ex. C, Bullaro Decl. ¶ 9). Bullaro added that LPN Byers "did not notify the mental health counselor or the Doctor of Colyer's condition or of the psychiatric medication Colyer was previously prescribed." (Id.)

According to Doctor Famiglio, LPN Byers "failed to adequately assess the situation and certainly did not comprehend the seriousness of the situation. An LPN's duty is to perform appropriate evaluation of a patient's status, collecting data and deciding who needs to be informed for a more thorough higher-level assessment and triage." (Doc. 98-4, Ex. D, Famiglio Decl. ¶ 12). Doctor Famiglio

33

also noted that "a simple phone call to the Medical Director would have initiated an immediate transfer to the Emergency Room. Certainly if no one is in the facility to competently assess an inmate the patient should be sent immediately to the ER." (Id.)

For instance, per Doctor Famiglio:

> LPN Byers does some form of an intake history and focused assessment, and then orders medications *routinely* through Diamond Pharmacy Services. LPN Byers notes [Colyer's] recent interactions with Dr. Patel, a psychiatrist, but elects not to order urgent or STAT meds despite his obvious psychosis. This occurred on a Friday afternoon, and it is not clear if the medications would be delivered before Sunday night or Monday AM. She confirms his prior meds by calling CVS pharmacy but orders the meds through Diamond, and they are marked as electronically signed . . . by the psychiatrist who later reports in his depo that he never was consulted, never heard of this patient, and certainly did not order meds. He reports in his depo he never takes on-call duties from the prison. He provides only a few hours on Thursdays via telemed. When an LPN cares for an acutely psychotic patient and does not consult *anyone* this itself is bad medicine. The mental health counselor that is present near medical in the facility was never consulted nor was the Medical Director. It was reported that LPN Byers told Lt. Tomlison that [Colyer] denied using meth, so [plaintiff] was taken off drug watch but still maintained in the observation cell.

(Id. ¶ 8).

Based on this evidence, Colyer's claim that LPN Byers failed to properly evaluate his condition creates a triable issue as to whether Byers was deliberately indifferent. This is so because a jury could conclude that Colyer was

denied medical treatment or that necessary medical treatment was delayed for non-medical reasons.  As the U.S. Supreme Court has noted in <u>Farmer</u>, an official may not escape liability by refusing to verify underlying facts that she strongly suspects to be true, or by declining to confirm inferences of risk that she strongly suspects exist. 511 U.S. at 843 n.8.  Because these circumstances may suggest that LPN Byers was aware that Colyer faced a substantial risk of harm yet failed to take action, the court cannot conclude as a matter of law that her conduct did not run afoul of the Eighth Amendment. The magistrate judge's recommendation to grant summary judgment on this issue will not be adopted.

### 4. Conspiracy Claim against Tomlinson and Chesney

Colyer also brings claims for conspiracy against Tomlinson and Chesney, alleging that these defendants conspired or acted in concert to assault him.  The R&R concluded that these claims fail and recommended granting summary judgment on two grounds: 1) Colyer failed to establish an underlying constitutional violation; and 2) plaintiff has not presented evidence from which a reasonable factfinder could infer that Tomlinson and Chesney had an agreement, understanding, or otherwise acted in concert to deprive him of his constitutional rights. The court only agrees with the latter ground.

A Section 1983 conspiracy claim requires proof that persons acting under color of state law "reached an understanding" to deprive plaintiff of his

35

constitutional rights. Adickes v. S. H. Kress & Co., 398 U.S. 144, 150–52 (1970). The rights at issue include those protected by the Due Process Clause of the Fourteenth Amendment. Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 293–94 (3d Cir. 2018).

"After a plaintiff establishes that the object of the conspiracy was the deprivation of a federally protected right, 'the rule is clear that' the plaintiff 'must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action.' " Id. at 295 (quoting Capogrosso v. The Supreme Ct. of New Jersey, 588 F.3d 180, 184–85 (3d Cir. 2009)). To demonstrate the existence of an agreement, a plaintiff must establish that the state actors "somehow reached an understanding to deny [the plaintiff] his rights[.]" Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993). In the absence of direct proof, a "meeting of the minds" or "understanding or agreement to conspire" may be inferred from circumstantial evidence. Startzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir. 2008). Id. Relevant circumstantial evidence may include actions or statements suggesting an understanding, the approximate time of the agreement, the conspirators involved, the durations of the conspiracy, or the objective of the conspiracy. Id. (quoting Great W. Mining & Min. Co. v. Fox Rothschild LLP, 615 F.3d 159, 178–79 (3d Cir. 2010)).

36

Inferring mental state from circumstantial evidence is a task typically reserved for the factfinder. Kedra v. Schroeter, 876 F.3d 424, 444 (3d Cir. 2017) (citing United States v. Wright, 665 F.3d 560, 569 (3d. Cir. 2012)).   For that reason, a conspiracy claim can only be defeated at summary judgment when "the moving parties' submissions . . . foreclose[ ] the possibility of the existence of certain facts from which 'it would be open to a jury ... to infer from the circumstances' that there had been a meeting of the minds [.]" Anderson, 477 U.S. at 249 (citing Adickes, 398 U.S. at 144 )).

In this case, Colyer's conspiracy claim fails for two reasons.  First, although Colyer's complaint contains the terms "conspiracy" and "acted in concert," Colyer has not presented any evidence from which a reasonable juror could conclude that Tomlinson and Chesney had any agreement or understanding or otherwise acted in concert to deprive him of a constitutional right. (Doc. 1, Compl. ¶ 66).  In fact, the plaintiff's brief in opposition to the instant motion does not even address the defendants' arguments concerning the conspiracy claim.

Second, plaintiff also failed to address the conspiracy claim in his objections.  Although Colyer states in his objections that he objects to Chief Magistrate Judge Bloom's recommendation to grant summary judgment on the conspiracy claim, he failed to present any new facts, legal authority, or argument in support of those objections.

Upon careful review, the record does not establish that Defendants Tomlinson and Chesney reached an understanding to deprive Colyer of his constitutional rights.  The court will therefore adopt the R&R's recommendation, and summary judgment will be granted in favor of the defendants on Colyer's conspiracy claim.

### 5. Qualified Immunity

Defendants assert that LPN Byers, Lieutenant Tomlinson, and Officer Chesney are entitled to qualified immunity on the Section 1983 claims asserted against them.  Based on the summary judgment record, the court will reject the R&R's analysis on this issue in part and deny qualified immunity to Tomlinson and Chesney.  The court, however, concludes that LPN Byers is entitled to qualified immunity.

"There is a well-settled two-part test to determine whether government officials should receive qualified immunity." Montemuro v. Jim Thorpe Area Sch. Dist., 99 F.4th 639, 642 (3d Cir. 2024) (citing Anglemeyer v. Ammons, 92 F.4th 184, 188 (3d Cir. 2024); Pearson v. Callahan, 555 U.S. 223, 236 (2009)).  To overcome the qualified immunity defense, a plaintiff must show: 1) that the official violated a statutory or constitutional right; and 2) that the right was clearly established at the time of the challenged conduct.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Although Colyer has presented sufficient evidence for a jury to consider his excessive force and medical claims, he must also satisfy the "clearly established" prong of the qualified immunity analysis with respect to his claims against LPN Byers, Lieutenant Tomlinson, and Officer Chesney. That is, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quotation and internal quotation marks omitted). Existing case law, "must give the official 'fair warning' that his conduct is unconstitutional." Stringer v. Cnty. of Bucks, 141 F.4th 76, 85 (3d Cir. 2025) (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

In conducting this analysis, the court must "first define the right specifically, based on the particular facts[,]" then "figure out if a reasonable [government official] would have been on notice that his conduct would violate that right." Otero v. Kane, 161 F.4th 189, 194 (3d Cir. 2025) (citations omitted). "Typically, analogous precedent from the Supreme Court or [the Third Circuit] or a consensus of persuasive authority in the Courts of Appeals is required." Stringer, 141 F.4th at 85 (citing Clark v. Coupe, 55 F.4th 167, 182 (3d Cir. 2022); Peroza-Benitez v. Smith, 994 F.3d 157, 165 (3d Cir. 2021)). Analogous means factually analogous. Clark, 55 F.4th at 181. This does not mean "a case directly on point,

39

but existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741.

To overcome qualified immunity, it must be clear to a reasonable official that their conduct was unlawful in the situation they confronted.  Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled on other grounds by Pearson, 555 U.S. at 236.  "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.' " Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting al-Kidd, 563 U.S. at 742)).  Put another way, "existing law must clearly establish that what [these prison officials] did in *these* circumstances violated the plaintiff's rights." Urda v. Sokso, 146 F.4th 311, 314 (3d Cir. 2025) (emphasis added).  Thus, "qualified immunity is not appropriate when the case in question presents 'extreme circumstances' to which 'a general constitutional rule already identified in the decisional law may apply with obvious clarity.' " Thomas, 88 F.4th at 284 (quoting Mack v. Yost, 63 F.4th 211, 231 (3d Cir. 2023)).

### a. Excessive Force

*Lieutenant Tomlinson and Officer Chesney* – Here, construing the facts in the light most favorable to Colyer, Lieutenant Tomlinson and Officer Chesney used excessive force against him which resulted in significant permanent injuries. "The Supreme Court has made clear that officers may not expose inmates to gratuitous force divorced from any legitimate penological purpose." Jacobs, 8

40

F.4th at 197 (citing Hope, 536 U.S. at 738)). "That alone would provide officers with at least 'some notice' that the treatment of [the inmate] was unlawful." Id. (citing Hope, 536 U.S. at 745)). "Additionally, the specific conduct here—striking a physically restrained and nonthreatening inmate—was clearly unlawful under the precedent of this Court and our sister circuits." Id. "[I]n 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued." Id. (quoting Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009)).

Here, at the time of the incident, clearly established law prohibited officers from punching an inmate in the lower abdomen or genital area or pulling and wrenching a subdued inmate's neck. A reasonable officer in Chesney and Tomlinson's position would have known that such conduct was unlawful. Therefore, the court concludes that, with respect to plaintiff's excessive force claim, Tomlinson and Chesney are not entitled to qualified immunity.

### b. Deliberate Indifference to Medical Needs

The governing standard for deliberate indifference is well settled. The Third Circuit Court of Appeals has recognized deliberate indifference where "there was 'objective evidence that a plaintiff had serious need for medical care,' and prison officials ignored that evidence." Natale, 318 F.3d at 582 (quoting Nicini v. Morra, 212 F.3d 798, 815 n. 14 (3d Cir. 2000)). The same is true where

41

" 'necessary medical treatment is delayed for non-medical reasons.' " Id. (quoting

Lanzaro, 834 F.2d at 347)).

   *Lieutenant Tomlinson and Officer Chesney* – With respect to Colyer's claim

for violation of his constitutional right to adequate medical care against

Lieutenant Tomlinson and Officer Chesney, Colyer contends in his brief in

opposition that "nothing in the record shows that defendants did not know that

Colyer was detoxing, mentally deteriorating and yet no reasonable steps were

taken to de-escalate Colyer's behavior but rather escalate Colyer's deterioration

by entering his cell." (Doc. 91-2, Br. in Opp. at 23).  Read in this context, this

argument is directed at Lieutenant Tomlinson and Officer Chesney, the officers

who entered Colyer's cell to order him to remove his shoes.

   Colyer's claim implicates two considerations: a substance-related

component and a mental health component.  The record is not a model of clarity

as to whether Colyer was actively detoxing or otherwise experiencing withdrawal.

At a minimum, however, that question presents a genuine dispute of material

fact.  Nonetheless, it forms a central part of the court's analysis.[16]

---

[16] Regarding the alleged denial of mental health treatment, plaintiff devotes little attention to this issue in his brief in opposition.  Even so, the Third Circuit has held that mental health treatment falls within the scope of medical care as defined by Estelle. See Inmates of Allegheny Cnty. Jail, 612 F.2d at 763 (holding that failure to provide treatment to a prisoner with mental illness could constitute deliberate indifference).

42

For Colyer's claims against Tomlinson and Chesney to proceed to trial, the law must have placed them on notice that their conduct was clearly unlawful. Bayer v. Monroe County Children & Youth Services, 577 F.3d 186, 193 (3d Cir. 2009). If the law did not, then they would be entitled to qualified immunity. Id. Put differently, " 'existing precedent must have placed the statutory or constitutional question beyond debate.' " Reichle v. Howards, 566 U.S. 658, 664 (2012) (quoting al-Kidd, 563 U.S. at 741)).

In his testimony, Tomlinson admitted that MCCF officers, including himself, "didn't know what [Colyer] had. We just knew he was suspected of having something [i.e., drugs]". (Doc. 83-7, Ex. F. Tomlinson Dep. at 89:12-17). Tomlinson acknowledged that Colyer told him "he did some meth before he came to jail." (Id. 135:136:3). Tomlinson also stated that Colyer's eyes appeared dilated, leading him to believe that plaintiff was using drugs. (Id. at 132:9-133:5). According to Tomlinson, he escorted Colyer to medical for evaluation because he was not in his right state of mind. (Id. at 13-14).

Officer Chesney similarly testified that he "just knew [Colyer] was on a drug" and that he was "not in the right state of mind." (Doc. 83-8, Ex. G. Chesney Dep. at 70:7-18, 71:18-22). Chesney further acknowledged that he had previously observed Colyer undergo withdrawal while incarcerated on several prior occasions. (Id. at 137:12-23).

43

Taken together, this evidence would support a finding that Colyer's medical need for medical attention was sufficiently obvious such that both defendants recognized it.

In Thomas, the Third Circuit has held that "when an officer is aware of the oral ingestion of narcotics by an arrestee under circumstances suggesting the amount consumed was sufficiently large that it posed a substantial risk to health or a risk of death, that officer must take reasonable steps to render medical care." 88 F.4th at 285. (collecting cases). As the Court of Appeals has explained, "that care would have been to take the arrestee to a hospital, as provided for in the Harrisburg Police Department policy." Id. (citing Hope, 536 U.S. at 741–42).

The Third Circuit rejected the following formulation of the right to medical care for individuals in custody of law enforcement, as advanced by the defendant officers in that case:

> [W]hether Mr. Thomas had a constitutional right established "beyond debate" to be taken to a hospital emergency room for treatment when none of the officers witnessed him ingest drugs, he repeatedly denied cocaine ingestion even when warned it could cause his death, his companions denied seeing cocaine, he denied experiencing symptoms consistent with cocaine or fentanyl toxicity, he did not request medical care, showed no overt signs of being in medical distress and was taken directly to the prison booking center where he was assessed medically and cleared by the prison's medical staff to remain.

Id. at 284.

44

Here, construing the facts in the light most favorable to Colyer, both Tomlinson and Chesney were aware that Colyer was in a compromised and potentially dangerous medical state. They observed clear signs of deterioration, Colyer becoming increasingly agitated, kicking the glass in his cell, and exhibiting escalating distress. However, Tomlinson and Chesney failed to take reasonable steps to obtain medical assistance.

Under these circumstances, a reasonable officer would understand that the obligation not to act with deliberate indifference to a detainee's serious medical needs requires affirmative steps to secure medical care, not the use of additional force. Indeed, a reasonable jury could conclude that actions such as punching Colyer or twisting his neck were not only unresponsive to his medical needs but affirmatively exacerbated the risk to his health.

Moreover, as previously discussed, there exists a genuine dispute of material fact as to whether Tomlinson and Chesney were deliberately indifferent to Colyer's serious medical needs. In light of that, the court cannot conclude that a reasonable officer in their position could have believed that their conduct was lawful. Accordingly, Lieutenant Tomlinson and Officer Chesney are not entitled to qualified immunity.

*LPN Byers* – Colyer also argues that LPN Byers is not entitled to qualified immunity. Plaintiff's contentions are directed solely to the period when LPN

45

Byers evaluated him prior to the restraining incident. Specifically, plaintiff asserts that LPN Byers: 1) failed to recognize that he was acutely psychiatrically deteriorating; 2) failed to perform an appropriate assessment of his medical and mental health condition; 3) failed to recognize the need for a higher level evaluation; 4) failed to order stat medications; 5) failed to contact the medical director or mental health consultant at MCCF; and 6) failed to transfer him to an emergency room for further care. (Doc. 91-2, Br. in Opp. at 26).

LPN Byers, however, offers a different account grounded in MCCF's established procedures. Byers testified that her role required her to obtain an inmate's vital signs, gather information regarding prescribed medications, and place orders for those medications through the jail pharmacy. (Doc. 83-10, Ex. I, Byers Dep. at 52:2-55:21). Where an inmate is prescribed psychiatric medication, Byers explained that she would place the inmate on a list for evaluation by a mental health counselor and notify that counselor by email. (Id. at 76:9-21, 84:15-22). According to LPN Byers, responsibility for escalating care, including referral to a psychiatrist, rested with the counselor, not with her, and she lacked authority to make direct psychiatric referrals. (Id. at 82:15-22). In other words, LPN Byers had no authority to make a direct referral to a psychiatrist. (Id. at 104:11-105:9).

With respect to the day in question, LPN Byers testified that she complied with these responsibilities. (Id. at 46:8-12, 76:3-82:22). She further stated that Colyer's vital signs were within normal limits and that she observed no basis to contact a physician. (Id. at 46:8-12, 65:4-68:4). Although she emailed the mental health counselor regarding Colyer and his prescriptions, the counselor was not around. (Id. at 83:7-11).

Notwithstanding this testimony, and for the reasons previously discussed, the record viewed in the light most favorable to plaintiff would permit a reasonable jury to conclude that LPN Byers violated Colyer's rights under the Eighth Amendment.

The qualified immunity inquiry, however, does not end with the identification of a constitutional violation. The court must also determine whether the law had placed LPN Byers on notice that her conduct was clearly unlawful. Bayer, 577 F.3d at 193. If not, then LPN Byers is entitled to qualified immunity. Id.

Neither party has identified, nor is the court aware of, precedent that would have placed a reasonable LPN in Byers's position on notice that her conduct violated the Eighth Amendment. To the contrary, the most analogous authority suggests claims of this nature, where the alleged wrongdoing arises from a failure to diagnose or to pursue additional testing, sound in negligence or medical

malpractice, not deliberate indifference. See Weigher v. Prison Health Servs., 402 F. App'x 668, 670 (3d Cir. 2010) (holding that a plaintiff's claim that a physician assistant "did not find anything wrong with [his] back and consequently did not help [him] with his back problem" is "a claim of misdiagnosis [which] would sound in negligence as a malpractice suit, and does not constitute deliberate indifference."); see also Cobbs v. Caputo, 578 F. App'x 84, 85 (3d Cir. 2014) (observing that a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice [.]") (quoting Estelle, 429 U.S. at 107)); Baker v. Younkin, 529 F. App'x 114, 116 (3d Cir. 2013) ("[A]side from conclusory statements asserting deliberate indifference to his medical needs, it is clear from [plaintiff's] allegations that [the prison health care administrator] did admit [him] to the infirmary in order to receive treatment . . . .").

In light of this precedent, the court cannot conclude that LPN Byers was on notice that her conduct was clearly unlawful.  The absence of controlling or closely analogous authority forecloses a finding that the constitutional right at issue was clearly established.[17]

---

[17] In Pearson v. Prison Health Serv., the Third Circuit held that a nurse could be found deliberately indifferent and thus not entitled to qualified immunity where that nurse "(1) refused to examine [an inmate] in his cell when the block officer first called medical, (2) forced [the inmate] to crawl to the wheelchair to obtain medical treatment, and (3) did nothing but order him placed in the infirmary overnight despite recognizing signs of appendicitis." 850 F.3d 526, 540 (3d Cir. 2017).

48

For the reasons discussed above, LPN Byers is entitled to qualified immunity. Summary judgment will therefore be entered in her favor on Colyer's deliberate indifference claim, and she will be dismissed from this action, as that claim is the sole basis for liability asserted against her.

## 6. Monell Claim

Colyer appears to assert Monell claims against both MCCF Warden Joshua Garver and Mifflin County in Count V. In doing so, however, Colyer conflates two distinct theories of liability, municipal liability under Monell and supervisory liability against Warden Garver.

### a. Supervisory Liability Claim Against Garver

A Monell claim is a claim against a municipality or other similar entity. See Connick v. Thompson, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under [Section 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting Monell v. Dep't of Soc. Servs. of City of New York,

---

The case at hand bears little resemblance to Pearson. The record here does not support a finding that LPN Byers refused to examine Colyer when he was brought to her for evaluation. Nor is there any evidence that she compelled plaintiff to engage in physically degrading conduct in order to receive care. To the contrary, LPN Byers evaluated Colyer, asked him questions, and initiated the process necessary to provide his prescribed medications. Accordingly, Pearson is materially distinguishable and does not place Byers on notice that her conduct, under these circumstances, would violate clearly established law.

436 U.S. 658, 692 (1978)).  A claim against individuals in their personal capacities such as Colyer's claim against Warden Garver is not a Monell claim.[18] See Mervilus v. Union Cnty., 73 F.4th 185, 197 n.5 (3d Cir. 2023) ("First, Mervilus sued Vaniska in his personal capacity, and thus he is an improper Monell defendant.").

In his opposition brief, Colyer frames his claim against Warden Garver as one for supervisory liability. (Doc. 91-2, Br. in Opp. at 20-21).  Colyer's claim against Warden Garver for supervisory liability is governed by a distinct standard from his failure-to-train claim against Mifflin County.

The Third Circuit has "recognized that 'there are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations.' " Parkell v.

---

[18] See Kentucky v. Graham, 473 U.S. 159, 165 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law … Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " (citation omitted) (quoting Monell, 436 U.S. at 690 n.55)). "There is no longer a need to bring official-capacity actions against local government officials, for under Monell, local government units can be sued directly for damages and injunctive or declaratory relief." Graham, 473 U.S. at 167 n.14; see also Collinson v. City of Philadelphia, No. CIV.A. 12-6114, 2015 WL 3622728, at *4 (E.D. Pa. June 10, 2015).

Danberg, 833 F.3d 313, 330 (3d Cir. 2016) (quoting Santiago v. Warminster Twp., 629 F.3d 121, 129 n.5 (3d Cir. 2010)).

"Failure to claims—failure to train, failure to discipline, or, as is the case here, failure to supervise—are generally considered a subcategory of policy or practice liability." Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316-17 (3d Cir. 2014), cert. granted, judgment rev'd sub nom. Taylor v. Barkes, 575 U.S. 822 (2015) (quotation and internal quotation marks omitted).

According to the Third Circuit:

> [A] plaintiff must identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.

Id. at 317 (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989); Brown v. Muhlenberg Twp., 269 F.3d 205 (3d Cir. 2001)).

Colyer fails to meet this standard.  Colyer focuses on the absence of an internal investigation and other after the fact conduct rather than on policies or conditions in place at the time of the alleged injury.  Plaintiff primarily relies on Warden Garver's testimony that the incident involving plaintiff was an "extraordinary occurrence" and that it was investigated by the Pennsylvania State

51

Police. (Doc. 91-2, Br. in Opp. at 21; Doc. 83-19, Ex. R., Garver Dep. at 23:17, 25:16-26:2). Although Garver did not personally review the State Police report, he discussed the incident with the State Police. (Id. at 26:16-22).

The record does not establish any existing policy or procedure in effect at the time of the alleged incident that created an unreasonable risk of a constitutional violation, that Garver was aware of such risk, or that he was deliberately indifferent to it. Nor does the record establish that Colyer's constitutional injuries were caused by Garver's failure to implement a supervisory practice or procedure. Therefore, Garver is entitled to summary judgment on plaintiff's supervisory liability claim.[19]

---

[19] Plaintiff also brought a claim for deliberate indifference to medical needs against Warden Garver and Mifflin County in Count VI.

With regards to Warden Garver, plaintiff failed to produce evidence showing that Garver established or maintained a policy of constitutional harm to Colyer or any inmate at MCCF. Furthermore, plaintiff failed to establish that Warden Garver was present at the time of the incident, or that Garver was involved with the medical care and/or decisions regarding medical care for Colyer. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*.") (citation omitted)). As such, summary judgment will be granted on plaintiff's claim against Warden Garver.

As for Mifflin County, to the extent that this is a Monell claim, it will be addressed in the municipal liability section. Otherwise, Colyer cannot bring a Section 1983 claim against Mifflin County for the unconstitutional acts of its employees on a theory of *respondeat superior*. Monell, 436 U.S. at 691.

## b. Municipal Liability

A municipality, such as Mifflin County, cannot be held liable under Section 1983 for the unconstitutional acts of its employees on a theory of *respondeat superior.* Monell, 436 U.S. at 691. Rather, "under § 1983, local governments are responsible only for 'their *own* illegal acts.' " Connick, 563 U.S. at 60 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)). "[A] § 1983 claim against a municipality may proceed in two ways." Forrest v. Parry, 930 F.3d 93, 105 (3d Cir. 2019). First, a plaintiff may show "that an unconstitutional policy or custom of the municipality led to his or her injuries." Id. Second, a plaintiff may establish that his injuries "were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.' " Id. (quoting Est. of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019)). This "latter avenue arose in the failure-to-train context, but applies to other failures and inadequacies by municipalities, including those related to supervision and discipline of its ... officers." Id. A plaintiff proceeding under the second theory need not identify an unconstitutional policy. Estate of Roman, 914 F.3d at 798. Rather, he must demonstrate that the municipality's failure to train, supervise, or discipline amounted "to deliberate indifference on the part of the municipality." Forrest, 930 F.3d at 106.

Colyer bases his claim against Mifflin County on a failure-to-train theory. To establish deliberate indifference, a plaintiff must show that: "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." Est. of Roman, 914 F.3d at 798 (quoting Doe v. Luzerne Cnty., 660 F.3d 169, 180 (3d Cir. 2011)).

Before addressing that claim, however, the court declines to adopt the R&R's conclusion that Mifflin County cannot be liable because no constitutional violation occurred. As explained above, the court has determined that Tomlinson and Chesney are not entitled to summary judgment on Colyer' excessive force and medical care claims. Accordingly, plaintiff has successfully established constitutional violations.

Even so, Colyer fails to satisfy the requisite elements of a failure-to-train claim. Plaintiff failed to demonstrate that Mifflin County made a deliberate or conscious choice with respect to training, supervision, or discipline. Instead, plaintiff's Monell claim rests primarily on the conduct of Warden Gaver, which, as discussed above, is insufficient to establish municipal liability. Accordingly, Mifflin County is entitled to summary judgment on Colyer's Monell claim.

54

### 7. State tort claims

Because some of Colyer's federal claims will proceed to trial, the court will exercise supplemental jurisdiction over his state law claims.

### a. The PSTCA does not bar tort claims brought against Lieutenant Tomlinson and Officer Chesney

Colyer asserts state law claims for assault, battery, and intentional infliction of emotional distress against Defendants Tomlinson and Chesney arising from the June 2019 incident. In their motion for summary judgment, defendants argue that they are entitled to immunity from plaintiff's state law tort claims pursuant to the Pennsylvania Political Subdivision Tort Claims Act, 42 PA. CONS. STAT. §§ 8541–8564, ("PSTCA"). Defendants contend that employees of local agencies are generally immune from tort liability and no exception to that immunity applies here. (Doc. 85, Br. in Supp. at 12). In response, plaintiff asserts that defendants are not entitled to immunity because a reasonable jury could find that their conduct constituted actual malice or willful misconduct.[20] (Doc. 91-2, Br. in Opp. at 15-16).

---

[20] The parties do not dispute that Mifflin County is a "local agency" for purposes of the PSTCA, and that Defendants Tomlinson and Chesney are County employees. See 42 PA. CONS. STAT. § 8501 (defining "local agency" as a "government unit other than the Commonwealth government.").

"Generally, local agencies are immune from tort liability under Section 8541 of the Tort Claims Act."[21] Gillingham v. Cnty. of Delaware, 154 A.3d 875, 877-78 (Pa. Commw. Ct. 2017) (internal citation and quotation marks omitted). However, pursuant to PSTCA Section 8550, "[a]n employee's immunity does not extend to acts that are judicially determined to be crimes, actual fraud, actual malice, or willful misconduct."[22] Renk v. City of Pittsburgh, 641 A.2d 289, 292 (Pa. 1994) (citing 42 PA. CONS. STAT. § 8550)).

The Third Circuit Court of Appeals has likewise recognized that "[e]mployees are not immune from liability under § 8545 where their conduct amounts to 'actual malice' or 'willful misconduct.' " Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006). Willful misconduct has been defined as "conduct whereby the actor desired to bring about the result that followed or . . . was aware that it was substantially certain to follow, so that such desire can be implied. Otherwise stated, the term willful misconduct is synonymous with the term intentional tort." Id. (quotation and internal quotation marks omitted).

---

[21] Section 8541 of the PSTCA provides that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof ...." 42 PA. CONS. STAT. § 8541.

[22] Aside from the exceptions for criminal activity, fraud, actual malice, or willful conduct, there are nine enumerated exceptions to PSTCA immunity: (1) vehicle liability; (2) care, custody or control of personal property; (3) real property; (4) trees, traffic control and street lighting; (5) utility services facilities; (6) streets; (7) sidewalks; and (8) care, custody, or control of animals; and (9) sexual abuse. 42 PA. CONS. STAT. § 8542(b)(1)–(9).

Here, Lieutenant Tomlinson and Officer Chesney's argument that the PSTCA bars Colyer's tort claims is not persuasive as a reasonable jury could find willful misconduct on the part of these defendants.

### b. Assault and Battery

Under Pennsylvania law, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." Renk, 641 A.2d 289 at 293 (quoting Cohen v. Lit Brothers, 70 A.2d 419, 421 (Pa. Super. Ct. 1950)). The Pennsylvania Supreme Court has explained that a law enforcement officer's liability for assault and battery turns on whether the force used was reasonable. Id. Stated differently, an officer may be liable where the factfinder determines that the force used was unnecessary or excessive. Id.; see Pelzer v. City of Phila., 656 F. Supp. 2d 517, 539 (E.D. Pa. 2009) ("Similar to a Fourth Amendment claim, the officer's liability will hinge on the reasonableness of the force used." (citation omitted)).

Here, for the reasons discussed above with respect to the plaintiff's excessive force claim, material factual disputes preclude summary judgment as to whether Lieutenant Tomlinson and Officer Chesney applied reasonable force during the June 2019 incident. See Rodriguez v. Panarello, 119 F. Supp. 3d 331, 345 (E.D. Pa. 2015) (finding an officer immune from an assault claim under the

PSTCA because the "conclusion that the use of force was objectively reasonable is also dispositive of the issue of willful misconduct."); see also Klein v. Madison, 374 F. Supp. 3d 389, 431 (E.D. Pa. 2019).

Because the court cannot determine whether the force used was reasonable without resolving disputed facts, the court is likewise precluded from determining whether Defendants Tomlinson and Chesney are entitled to summary judgment on the basis that their actions were not willful under the PSTCA.

### c. Intentional Infliction of Emotional Distress Claims

Count III of the plaintiff's complaint asserts IIED claims against Defendants Tomlinson and Chesney.  To plead an IIED claim under Pennsylvania law, a plaintiff must set forth facts supporting four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." Jordan v. Pennsylvania State Univ., 276 A.3d 751, 775 (Pa. Super. Ct. 2022) (citations omitted).

The conduct at issue "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988) (quoting Buczek v. First Nat'l Bank

of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)). Additionally, to recover damages for IIED, the plaintiff "must suffer some type of resulting physical harm due to the defendant's outrageous conduct." Reedy, 615 F.3d at 231.

Here, with regards to the first two elements—extreme and outrageous conduct as well as intentional or reckless conduct—Colyer alleges that Lieutenant Tomlinson and Officer Chesney intentionally and deliberately inflicted emotional distress upon him by repeatedly assaulting and battering him, including kicking, punching, tasering, and wrestling him to the ground. (Doc. 1, Compl. ¶¶ 60-61). Colyer further asserts that such conduct was extreme and outrageous. (Id.)

Upon careful review of the record, including the video footage, a reasonable jury could agree with Colyer and conclude that the officers' conduct was extreme and outrageous and that it was intentional or reckless.

As to the severe emotional distress, Colyer alleges that he suffered severe emotional distress, including mental anguish, severe emotional trauma, embarrassment, loss of sleep, loss of appetite, and humiliation. (Id. ¶ 64). The record also reflects that Colyer suffered significant cognitive and physical impairments and was ultimately declared an incapacitated person. Based on

this, a reasonable jury could conclude that Colyer suffered severe emotional distress.

Accordingly, defendants' motion for summary judgment will be denied as to the IIED claims against Defendants Tomlinson and Chesney.

### 8. Doe Defendants

Plaintiff's submissions have failed to identify "Unknown Correctional Officers John Does 1-10" and "Unknown Medical Providers John Does 1-10." Under the law, "Doe defendants 'are routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed.' " Hindes v. F.D.I.C., 137 F.3d 148, 155 (3d Cir. 1998) (quoting Scheetz v. Morning Call, Inc., 130 F.R.D. 34, 36 (E.D. Pa. 1990)). A plaintiff must identify a Doe defendant because, if discovery yields no identities, fictitious parties must eventually be dismissed. See id. (citing Scheetz, 130 F.R.D. at 37).

Moreover, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." FED. R. CIV. P. 21. Put another way, "Rule 21 empowers courts to police the litigation's cast of characters." Avenatti v. Fox News Network LLC, 41 F.4th 125, 130 (3d Cir. 2022).

Where a plaintiff has had a reasonable opportunity to conduct discovery and ascertain the identity of a John Doe defendant but has failed to do so, dismissal of the John Doe defendant is appropriate. Blakeslee v. Clinton Cnty.,

60

336 F. App'x 248, 250 (3d Cir. 2009).  Courts in the Third Circuit have used Rule 21 to exclude Doe parties from an action under appropriate circumstances, such as the failure to identify individuals during discovery. See King v. Mansfield Univ. of Pennsylvania, No. 1:11-CV-1112, 2014 WL 4546524, at *10 (M.D. Pa. Sept. 12, 2014) (Brann, J.) (collecting cases).  Moreover, at the summary judgment stage, claims against unidentified defendants cannot proceed to trial because the plaintiff cannot establish that a genuine dispute of material fact exists as to any particular individual. See Celotex Corp., 477 U.S. at 322–23.

At this stage, discovery has been closed, and plaintiff has not identified Correctional Officers John Does 1-10 or Medical Providers John Does 1-10.  The court will thus dismiss all claims against those defendants under Rule 21.

### 9. Punitive Damages

Colyer seeks punitive damages against all defendants. (Doc. 1, Compl. ¶ 143).  Defendants, in turn, argue that Colyer's request fails as a matter of law. (Doc. 85, Br. in Supp. at 31).

*Lieutenant Tomlinson and Officer Chesney* – The U.S. Supreme Court has held that there is "no reason why a person whose federally guaranteed rights have been violated should be granted a more restrictive remedy than a person asserting an ordinary tort cause of action." Smith v. Wade, 461 U.S. 30, 48-49 (1983). Thus, "[p]unitive damages are available in an action under § 1983 [.]"

61

Tammaro v. Cnty. of Chester, Pocopson Home, 586 F. Supp. 3d 347, 353 (E.D. Pa. 2022). To recover punitive damages, "the defendant's conduct [must be] shown to be motivated by evil motive or intent, or ... involve[ ] reckless or callous indifference to the federally protected rights of others.' " Thomas v. City of Philadelphia, 290 F. Supp. 3d 371, 388 (E.D. Pa. 2018).

At the outset, it is appropriate to distinguish between defendants sued in their individual capacities and those sued in their official capacities. "A court cannot impose a punitive damages award against an official acting in his or her individual capacity unless the actor's conduct is, at a minimum, reckless or callous." Startzell v. City of Philadelphia, No. CIV.A.05-05287, 2007 WL 172400, at *22 (E.D. Pa. Jan. 18, 2007) (citing Brennan v. Norton, 350 F.3d 399, 428–29 (3d Cir. 2003)).

On the other hand, the Third Circuit has stated that punitive damages cannot be recovered against state actors sued in their official capacity. See Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988) ("Punitive damages cannot be recovered from defendants in their official capacities."). The U.S. Supreme Court has held "that a municipality is immune from punitive damages under" Section 1983. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981). Likewise, Pennsylvania does not hold "a political subdivision ... liable for punitive

damages." <u>Torres v. Allentown Police Dep't</u>, No. CIV.A. 13-3066, 2014 WL 4081477, at *11 (E.D. Pa. Aug. 18, 2014) (citing 42 PA. CONS. STAT. § 8553(c)).

Accordingly, Colyer cannot pursue punitive damages against Mifflin County or against Defendants Chesney and Tomlinson in their official capacities.

By contrast, punitive damages may be available against defendants sued in their individual capacities.[23] <u>See</u> <u>Farmer</u>, 511 U.S. at 836–37 ("[D]eliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

As explained above, the court has concluded that plaintiff has presented sufficient evidence from which a reasonable jury could find that Defendants Chesney and Tomlinson were deliberately indifferent to Colyer's serious medical

---

[23] The parties do not dispute that Colyer asserts claims against Defendants Tomlinson and Chesney in their individual capacities.

Under Pennsylvania law, punitive damages may be awarded " 'for conduct that is outrageous because of the defendant's evil motive or his reckless indifference to the rights of others.' " <u>Madison v. Bethanna, Inc.</u>, No. 12–01330, 2012 WL 1867459, at *13 (E.D. Pa. May 23, 2012) (quoting <u>Rizzo v. Haines</u>, 555 A.2d 58, 69 (Pa. 1989)). Specifically, " '[a] court may award punitive damages only if the conduct was malicious, wanton, reckless, willful, or oppressive.' " <u>Id.</u> (quoting <u>Rizzo</u>, 555 A.2d at 69)). The Pennsylvania Supreme Court has defined willful misconduct as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." <u>Sanford</u>, 456 F.3d at 315 (quoting <u>Renk</u>, 641 A.2d at 293)). The Third Circuit Court of Appeals has further clarified that willful misconduct requires more than recklessness, deliberate indifference, or the knowing disregard of risk; rather, it requires a showing of "specific intent." <u>Bright v. Westmoreland Cnty.</u>, 443 F.3d 276, 287 (3d Cir. 2006).

needs.[24]  A reasonable jury could thus conclude that these defendants acted with reckless indifference to plaintiff's federally protected rights.

Accordingly, Mifflin County is entitled to summary judgment insofar as it seeks dismissal of plaintiff's request for punitive damages.  Defendants Chesney and Tomlinson's motion will be denied with respect to punitive damages against them in their individual capacities.

**Conclusion**

For the reasons set forth above, Colyer's objections will be sustained in part, (Doc. 101), the R&R, (Doc. 100), will not be adopted in its entirety, and the defendants' motion for summary judgment, (Doc. 84), will be granted in part and denied in part.  Specifically, the R&R will be adopted insofar as it recommends granting summary judgment on the following claims:

- Count IV – Conspiracy to Violate Federal and State Civil Rights Against Defendants Tomlinson and Chesney;

- Count V – Failure to Train, Supervise, and Discipline Against Mifflin County and Warden Garver;

- Count VI – Deliberate Indifference to Serious Medical Needs Against Mifflin County and Warden Garver; and

- Count VIII – Deliberate Indifference to Serious Medical Needs Against LPN Byers.

---

[24] Because summary judgment will be granted on plaintiff's claims against LPN Byers and Warden Garver, Colyer is not entitled to recover punitive damages from these defendants.

The court will decline to adopt the R&R, however, to the extent it recommends granting summary judgment on the following claims:

- Count I – Excessive Force Claims Against Defendants Tomlinson and Chesney;

- Count II – Assault & Battery Against Defendants Tomlinson and Chesney;

- Count III – IIED Against Defendants Tomlinson and Chesney; and

- Count VII – Deliberate Indifference to Serious Medical Needs Against Defendants Tomlinson and Chesney.

Accordingly, defendants' motion for summary judgment will be granted as to Counts IV, V, VI, and VIII. The motion will be denied as to Counts I, II, III, and VII. The motion will also be denied as to Colyer's request for punitive damages against Defendants Tomlinson and Chesney individually. However, Mifflin County, Warden Garver, and LPN Byers are entitled to summary judgment insofar as they seek judgment on plaintiff's claim for punitive damages. Lastly, Unknown Correctional Officers John Does 1-10, Unknown Medical Providers John Does 1-10, Mifflin County, LPN Byers, and Warden Garver will be dismissed from this action. An appropriate order follows.

Date: _4/17/26_

JUDGE JULIA K. MUNLEY
United States District Court

65